AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

United States of America
v.

FARID ALBERTO MORALES ARAYA

*Defendant(s)*

Case No. 3:25-mj-1556-PDB

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of XXXX in the county of XXXX in the XXXX District of XXXX, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| On or about May 2-5, 2025, in the country of Costa Rica and elsewhere, the defendants violated: 21 U.S.C. §§ 959(a), 960(b)(1)(H), 963; 18 U.S.C. § 2. | Conspiracy to distribute 500 grams or more of methamhetamine for purposes of unlawful importation into the United States. Distribution of 500 grams or more of methamhetamine for purposes of unlawful importation into the United States. Attempted distribution of 500 grams or more of methamphetamine for purposes of unlawful importation into the United States. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Kevin Doheny, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/17/25

[signature]
*Judge's signature*

City and state: Jacksonville, Florida

Joel B. Toomey, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin Doheny, a Special Agent (SA) with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

1. This affidavit is submitted in support of complaints and arrest warrants for two individuals, Farid Alberto MORALES ARAYA (MORALES ARAYA) and Jose Franklin CUESTA (CUESTA). There is probable cause to believe that MORALES ARAYA and CUESTA attempted to distribute, conspired to distribute, and distributed 500 grams or more of methamphetamine, intending, knowing, and having reasonable cause to believe that the methamphetamine would be unlawfully imported into the United States in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(H), and 963; and 18 U.S.C. § 2.

2. The statements set forth in this affidavit are based upon my training and experience, consultation with other experienced investigators, agents, and other sources of information related to this and other investigations. This affidavit is intended to set forth probable cause in support of the criminal complaints and arrest warrants and does not purport to set forth all of my knowledge or the entirety of the facts of this investigation. Unless otherwise specified, the undercover officer, confidential source, and defendants described herein communicated in Spanish.

## BACKGROUND OF AFFIANT

3. I am a SA with the DEA, and as such, I am empowered under 21 U.S.C. § 878 and other criminal laws of the United States, to make arrests, and obtain and execute search, seizure, and arrest warrants. I have been a SA with DEA since 2017;

prior to joining DEA, I was a police officer with the Panama City Police Department in Panama City, Florida for approximately seven years.

4. As part of my official duties, I investigate civil and criminal violations of the Controlled Substances Act, Title 21 of the United States Code. During the course of my career in law enforcement, I have participated in numerous drug trafficking investigations, conducted electronic surveillance, and spoken with defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and of the laundering and concealing of proceeds from controlled substance trafficking. In furtherance of my investigations, I have used numerous investigative techniques, including undercover transactions, controlled purchases, and been granted federal and state search warrants.

## PROBABLE CAUSE

5. The DEA has an office in Costa Rica and works closely with Costa Rican authorities to enforce Costa Rican and international drug laws. In April 2025, the DEA, in coordination with the Costa Rican DEA Vetted Unit (VU) called Unidad Antidrogas (UAD), which is comprised of officers from the Policia de Control de Drogas (PCD) and Fuerza Publica (FP),[1] received information regarding a transnational criminal organization (TCO) based in San Jose, Costa Rica.

---

[1] PCD and FP are Costa Rican law enforcement groups. A "vetted" unit includes hand-picked local officers who undergo a series of checks and investigations to work on high-profile international investigations.

6. I did not personally participate in the operations described below but instead learned the following information from reviewing Costa Rican law enforcement reports, photographs, speaking with other special agents in Costa Rica and elsewhere, and reviewing audio and video recordings, messages, and reports with the aid of an agent who speaks Spanish.

7. The DEA learned that the TCO was distributing methamphetamine on a medium and large scale, in part, through MORALES ARAYA, who used the alias "Beto." MORALES ARAYA is a Costa Rican national. The DEA further learned that MORALES ARAYA's role was to negotiate drug deals on behalf of the TCO.

8. In furtherance of the investigation, a DEA confidential source (CS) and, later a Costa Rican VU undercover officer (UC) learned that MORALES ARAYA could provide multi-kilogram quantities of methamphetamine and would assist in providing an initial kilogram of methamphetamine prior to distributing a larger quantity. The CS used in this investigation is a paid informant.

9. The CS and MORALES ARAYA had numerous conversations, during which the CS explained the plan was to deliver the product into the United States with a final intended destination of Arizona. The controlled calls with the CS were recorded. During a call prior to the controlled buy, MORALES ARAYA offered to sell 50 kilograms of methamphetamine for $3,800 United States Dollars (USD) each. On April 30, 2025, MORALES ARAYA sent a video of red containers containing suspected methamphetamine and clear bags containing suspected methamphetamine to the CS. The video included a newspaper with the phrase "SEÑOR ARIZONA"

and "5:12pm" written at the top. The CS then introduced the UC to MORALES ARAYA, who agreed to meet at McDonald's in Sabana section of San Jose, Costa Rica, on May 2, 2025, to discuss the drug purchase.

10. The UC knew he/she was speaking with MORALES ARAYA because the phone number he/she was communicating with was known to belong to MORALES ARAYA, and, as set forth below, a meeting time was set during the communications and MORALES ARAYA himself showed up to that meeting. MORALES ARAYA was later positively identified during the investigation.

**May 2, 2025 Controlled Buy**

11. On May 2, 2025, VU officers conducted a briefing, during which it was planned that the UC would meet with MORALES ARAYA regarding a potential controlled buy of methamphetamine.

12. During the afternoon of May 2, 2025, VU officers established surveillance in the McDonald's parking lot. The UC arrived at McDonald's, accompanied by a second UC (UC2); however, UC2 played a minimal role. At approximately 5:17 p.m., the VU observed a black Dodge Journey with license plate BDJ-797 arrive at the McDonald's. The VU identified the driver of the Dodge Journey as MORALES ARAYA and the front passenger as CUESTA. The UC and MORALES ARAYA went inside McDonald's and spoke, while CUESTA remained in the Dodge Journey. The VU observed that MORALES ARAYA was wearing a white shirt, gray jeans, and black shoes.

13. During the conversation inside the McDonald's, the UC and MORALES ARAYA discussed the controlled buy, and the UC explained that the methamphetamine was intended to go to the United States, specifically Arizona, but the UC explained he/she wanted to purchase a sample before making a larger purchase.

14. Shortly after, the UC and MORALES ARAYA exited the McDonald's and went to the UC vehicle. While at the UC vehicle, MORALES ARAYA made a phone call; immediately after, the VU observed CUESTA exit the Dodge Journey and go to the UC vehicle. CUESTA, wearing a white shirt and blue jeans, was carrying a brown bag with the phrase "Shoe Lab" on the bag. The UC and CUESTA got into the UC vehicle, where UC2 was sitting, while MORALES ARAYA waited outside of the vehicle.

15. CUESTA handed the UC the bag with "Shoe Lab" on it, which contained a red Nike shoe box that had a vacuum sealed plastic container containing suspected methamphetamine. The container was clear with a red lid and the suspected methamphetamine was loose in the container. During the controlled buy, the UC explained to CUESTA that the methamphetamine was going to the United States, specifically Arizona. After receiving the bag containing the methamphetamine, the UC gave $3,800 to CUESTA, who collected the cash and left the UC vehicle. MORALES ARAYA and CUESTA returned to the Dodge and left.

16. Immediately after the controlled buy described above, the UC went to the Central Offices of the Policia de Control de Drogas (a drug investigative law

enforcement agency), and, as witnessed by other PCD/VU officers, placed the suspected methamphetamine into evidence. The suspected methamphetamine had a total approximate weight of 1,050 grams and field-tested positive for methamphetamine. The suspected methamphetamine was then submitted to the Costa Rican Forensic Sciences Laboratory, Analytical Chemistry Section for analysis, which confirmed substance was methamphetamine with substance weight of 966.54 grams.

**Arrests on May 5, 2025**

17. On May 5, 2025, VU officers conducted a briefing, during which it was planned that the UC would meet with MORALES ARAYA at a Walmart in San Sebastian section of San Jose, Costa Rica, and negotiate the purchase of an additional 49 kilograms of methamphetamine. After the briefing, the VU established surveillance in and around the parking lot of the Walmart.

18. On the morning of May 5, 2025, the UC, along with UC2, met with MORALES ARAYA in the Walmart parking lot as planned. However, the UC and MORALES ARAYA failed to reach an agreement after a series of negotiations because MORALES ARAYA wanted to see the money prior to the buy. Thus, no agreement was reached and MORALES ARAYA left.

19. The VU observed MORALES-ARAYA get into the black Dodge Journey with license plate BDJ-797 and observed that CUESTA was the front passenger. Costa Rican law enforcement authorities followed the Dodge to a commercial property, where MORALES ARAYA and CUESTA met with another individual driving a Mitsubishi Outlander with license plate BNT-158. The Dodge and

Mitsubishi parked so the trunks faced each other. CUESTA then removed three cardboard boxes from the Dodge and put them in the Mitsubishi. Subsequently, both vehicles left in different directions.

20. The VU followed both the Dodge and Mitsubishi. The Mitsubishi went on the Uruca Crossing and drove in atypical pattern indicative of an attempt to evade law enforcement. At approximately 2:00 p.m., the VU stopped the Mitsubishi on the north side of the Tibas Walmart. During the traffic stop, the VU contacted the driver and sole occupant of the Mitsubishi. The VU observed the Mitsubishi continuously from the time CUESTA put the boxes in it until it was stopped.

21. The VU conducted a lawful search of the Mitsubishi. Inside, there were three black plastic bags that contained three brown cardboard boxes with "Gold City" on them. The brown cardboard boxes looked similar to the boxes that the VU observed CUESTA move from the Dodge into the Mitsubishi. The first box contained 14 vacuum-sealed transparent plastic containers with red lids. A random package of suspected methamphetamine from this box field-tested positive for methamphetamine and weighed approximately 1,120 grams. The second box contained 16 packages of suspected methamphetamine. A random package of suspected methamphetamine from this box field-tested positive for methamphetamine and weighed approximately 1,175 grams. The third box contained 12 packages of suspected methamphetamine. A random package of suspected methamphetamine from this box field-tested positive for methamphetamine and weighed approximately 1,050 grams. The methamphetamine was packaged in a similar manner as the methamphetamine from the controlled buy

on May 2, 2025, in that the container was vacuum-sealed, had a transparent bottom, and red lip.

22. In total, Costa Rican law enforcement authorities located 47 packages of methamphetamine from the Mitsubishi. In addition to the red and clear containers of methamphetamine described above, the VU also located clear bags with suspected methamphetamine and a cloth bag with suspected methamphetamine, which had a total approximate weight of five kilograms. A randomly selected bag with suspected methamphetamine weighed approximately 1,050 grams and field-tested positive for methamphetamine. Again, in total, approximately 47 kilograms of methamphetamine were seized from the Mitsubishi. Notably, the packages seized from the Mitsubishi looked like the packages from the video that MORALES ARAYA previously sent. And the boxes containing the methamphetamine match the boxes that Costa Rican law enforcement authorities observed CUESTA transfer into the Mitsubishi after the failed second deal.

23. Inside the Mitsubishi, the VU also located a blue Samsung cell phone with sim card, and a Redmi cell phone with sim card. A further search of the Mitsubishi revealed a hidden compartment in the floor but it was empty. The VU collected the methamphetamine, cell phones, and sim cards, then processed them into evidence in Costa Rica. A search of the Mitsubishi driver's person revealed he had two red Bac credit cards, Price Smart cards, his identification card, USD, and colónes (Costa Rican currency).

24. At approximately the same time that the Mitsubishi left the commercial property, the Dodge also left and was followed by the VU. The Dodge drove on San Francisco de Dos Rios route then parked on the side of the road. At approximately 2:00 p.m., the VU contacted the Dodge, which was driven by MORALES ARAYA, with CUESTA in the front passenger seat.

25. During a lawful search of the Dodge, the VU located a wallet belonging to MORALES ARAYA in the driver door. The wallet contained MORALES ARAYA's identification card, colónes, USD, and a European currency, which were documented and photographed. The VU also located a light blue Realme cell phone with Liberty sim card, black Honor cell phone, gray Motorola cell phone without a sim card, a second Liberty sim card, and a Hibezos 256GB mass storage device. The VU collected the cell phones, sim cards, and mass storage device, then put them into evidence in Costa Rica. However, no drugs were located in the Dodge.

26. Both the Dodge and the Mitsubishi were constantly surveilled by Costa Rican law enforcement authorities from the time they departed the property (after CUESTA transferred the boxes) until the time they were stopped and searched.

27. Officers arrested MORALES ARAYA, CUESTA, and the driver of the Mitsubishi, then booked them in to Public Ministry of Costa Rica, First Circuit, San Jose judicial section. The items described herein were photographed and collected, then submitted into evidence at the PCD station.

**The Exportation of Methamphetamine to the United States**

28. I am aware that methamphetamine, or "meth," is a stimulant drug that speeds up the body's central nervous system and is highly addictive. Methamphetamine comes in pill, powder, or crystal form and is swallowed, snorted, injected, or smoked. Crystal methamphetamine, as purchased and seized in this case, resembles glass fragments and is an illegal drug that differs from the FDA-approved prescription medication called Desoxyn.

29. Methamphetamine is typically produced in super labs in Mexico and Mexican drug trafficking organizations have become the primary manufactures and distributors of methamphetamine. It is common for Mexican drug trafficking organizations to coordinate methamphetamine shipments in the United States and Central America, which includes Costa Rica.

30. Methamphetamine is a Controlled Substances Act Schedule II stimulant substance, which means it has a high potential for abuse but also has an accepted medical use for treatment in the United States. The only current legal methamphetamine product Desoxyn is available by prescription only and cannot be refilled, which is prescribed in 5 milligram tablets and has very limited use. Medical grade methamphetamine is regulated by the United States government; whereas, clandestine-made methamphetamine is not.

**Conclusion**

31. Based upon the aforementioned information, events, and my training and experience, there is probable cause to believe that MORALES ARAYA and

CUESTA attempted to distribute, conspired to distribute, and distributed 500 grams or more of methamphetamine, intending, knowing, and having reasonable cause to believe that the methamphetamine would be unlawfully imported into the United States in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(H), and 963; and 18 U.S.C. § 2.

I, Kevin Doheny, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

Kevin Doheny
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on November 17, 2025.

JOEL B. TOOMEY
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF FLORIDA